UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **CHARLES DEDES**, | 2:18-CV-10082 |
| Plaintiff, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **MACOMB COUNTY**, et al., | |
| Defendants. | |

Plaintiff, a former inmate at Macomb County Jail, alleges that Defendants, corrections officers at the jail, used excessive force in subduing Plaintiff during a prison disturbance. Video cameras from several vantage points in the jail recorded the interaction, though they did not include audio. After carefully reviewing the videos of the incident and viewing the facts in the light most favorable to Plaintiff, the Court finds that the record demonstrates that the officers clearly used force to subdue the Plaintiff, but that with exception to the actions of a single officer, the available proof does not allow a reasonable inference that the level of force was applied maliciously and sadistically by the officers, and that the purpose of the force was to cause harm to Plaintiff. Accordingly,

1

the Motion for Summary Judgment will be granted in part and denied in part.

## I.    Facts

Plaintiff Charles Dedes was a post-conviction inmate serving his sentence on weekends at Macomb County Jail.  At approximately 9:00 P.M. on January 30, 2016, Plaintiff was in the jail's dayroom with other inmates when deputies arrived with an intoxicated driver.  Dedes Dep., ECF No. 64-2, PageID.1315.  As deputies attempted to change the intoxicated driver into a prison uniform, the inmates in the dayroom began shouting and banging on glass windows looking into the adjacent booking room, in what the deputies believed was an attempt to "rile up" the intoxicated driver.    Allen Dep., ECF No. 64-6, PageID.1360.  Defendant Matthew Pecha then gave an order to "lockdown" the unit— which required that all inmates return to their cells.  *Id.* at PageID.1361.

The parties dispute some of the facts and the meaning of what happened next, but the Court is aided in this matter by the existence of seven videos from prison security cameras.  Ex. 8, ECF No. 61.  For example, security camera video shows Plaintiff, after returning to "B Unit" from the dayroom, walking up to the glass door leading to the

hallway outside "B Unit." Ex. 8, "Interior B Unit" video at 8:48:33, ECF No. 61. Plaintiff then turns around and begins to walk toward his cell while turning back toward the door, apparently talking to the Defendant officers as they enter the unit. *Id.* at 8:48:33–43. The videotape does not have audio, so there is no sound recording of what Plaintiff or the Defendant officers were saying. Plaintiff and the Defendants disagree about what Plaintiff said to the Defendant officers. Plaintiff claims that he turned back and asked "[w]hy do we have to lockdown?" ECF No. 64, PageID.1266; Dedes Dep., ECF No. 64-2, PageID.1317. Defendants claim Plaintiff became agitated and yelled "I don't give a fuck about you" at Defendants. Allen Dep., ECF No. 58-11, PageID.665. Defendant Allen, believing Plaintiff was acting belligerent, decided to separate him from the rest of the inmates. *Id.* at PageID.666. She instructed Plaintiff to turn around and approach her so she could take him to holding cell "C". *Id.* Plaintiff then turned around, and he can be seen gesturing with his arms in what appears to be protest or exasperation, and he walked quickly past Allen and through the doorway into the hallway outside "B Unit." Ex. 8, "Interior B Unit" video at 8:48:36–50, ECF No. 61.

Once through the doorway into "A-B Hallway," Allen places her hands on Plaintiff's back as Plaintiff walks in front of her, and she steers Plaintiff to place him against the wall opposite the doorway. Ex. 8, "A-B Hallway" video at 8:49:24–26, ECF No. 61. Once at the wall, Plaintiff twists around at the waist to face Allen. *Id.* at 8:49:28. According to Allen, at that point Plaintiff yelled at her to "get [her] F'ing hands off of him." Allen Dep., ECF No. 58-11, PageID.671. Plaintiff says he "do[esn't] know if [he] said the fucking word, but [he] told her don't put your hands on me for sure." Dedes Dep., ECF No. 64-2, PageID.1333.

As this confrontation is happening, seven other officers arrive and begin to engage in trying to physically restrain Plaintiff. *Id.* at 8:49:28–34. With officers holding onto Plaintiff's arms, Plaintiff proceeds a few feet down the hall before being pressed against the glass windows again, then shuffling back a few steps in the direction from which he came. Ex. 8, "A-B and Property" video at 8:49:30–35, ECF No. 61. From viewing the video, it is unclear how much Plaintiff is being pushed down the hall by the officers and how much Plaintiff is actually dragging the officers down the hall. What is clear, however, is that all parties are engaged in a physical struggle that is inconsistent with what one would expect to see

when a prisoner is being compliant and cooperative. At approximately 8:49:45, Plaintiff is forced to the ground and Defendant Zaliwski can be seen administering approximately six to eight knee strikes to Plaintiff's hip region. Ex. 8, "A-B Hallway" video at 8:49:50–50:47, ECF No. 61. At the same time, Defendant Yadon can be seen applying knee strikes to Plaintiff's upper body and Defendant Marschke can be seen striking Plaintiff's head region with what appears to be his forearm. *Id.* at 8:49:54–59. During the scrum, the flash of Defendant Pecha's taser can be seen. *Id.* at 8:50:00–29; Ex. 8, "A-B and Property" video at 8:49:50, ECF No. 61. Pecha tased Plaintiff three or four times in "drive stun" mode.[1] Pecha Dep., ECF No. 64-13, PageID.1449.

At approximately 8:50:45, some sixty seconds after Plaintiff was taken to the ground, Defendants begin standing up and Plaintiff can be seen handcuffed on the ground. Ex. 8, "A-B Hallway" video at 8:50:52, ECF No. 61. At approximately 8:51:50, Plaintiff is brought to his feet and escorted, handcuffed with his hands behind his back, into a separate cell

---

[1] "In drive-stun mode, 'the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock . . . but does not cause an override of the victim's central nervous system as it does in dart-mode.'" *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012) (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc))."

in another section of the jail.  Ex. 8, "C Unit Booking" video at 8:51:46, ECF No. 61.  Plaintiff was then uncuffed and left in his cell.  The parties agree that during the scuffle Plaintiff suffered a black eye, bodily and facial bruising, and a chipped tooth.  Ex. M, ECF No. 64-14.

## II.    Contentions

Plaintiff alleges that he was not resisting Defendants' attempts to move him and that Defendants applied excessive force in violation of the Eighth Amendment's prohibition of cruel and unusual punishment.  Am. Compl., ECF No. 39, PageID.149.  Plaintiff further alleges under a *Monell* theory that Defendant Macomb County failed to adequately train, supervise, and discipline officers in the appropriate use of force.  *Id.* at PageID.152.  Plaintiff brings both claims pursuant to 42 U.S.C. § 1983.

Defendants contend that Plaintiff was acting belligerently and that the force used to subdue Plaintiff was applied in a good faith effort to restore discipline and not maliciously or sadistically for the purpose of causing harm to Plaintiff.  ECF No. 58, PageID.303.  Defendants assert that officers were attending to the intoxicated driver when Plaintiff's disruptive conduct caused Defendants to have to order a lockdown in order to prevent the intoxicated driver from becoming "riled up."  *Id.* at

PageID.324. When told to lockdown, Plaintiff became agitated and argumentative, and resisted being restrained and moved to a different holding cell. *Id.* Defendants assert that force was necessary in order to prevent escalation of the incident, because when the incident began, many other prisoners were in proximity to Plaintiff and unconstrained because they were in the midst of complying with the lock-down order. *Id.* at PageID.325.

## III. Legal Standard

### a. Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the

non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).  When events at issue are captured on videotape, however, the Court must view the facts as depicted in the videotape.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### b. Eighth Amendment

Prisoners are protected from the use of excessive force by the Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  To make out a claim under the Eighth Amendment, the prisoner must satisfy both an objective and a subjective component.  *See Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011).

The objective component requires the pain inflicted to be "sufficiently serious."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  This is a "contextual" inquiry that is "responsive to contemporary standards of decency."  *Hudson v. McMillian*, 503 U.S. 1, 8–9 (1992) (internal citation and quotation marks omitted).

The subjective component focuses on the state of mind of the prison officials. The relevant inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (internal quotation marks omitted). Courts may consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." *Whitley*, 475 U.S. at 321. Courts may also consider the circumstances "as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.* The reasonableness of a defendant's actions is an appropriate matter to determine on summary judgment. *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (explaining that *Scott* "instructs us to determine as a matter of law whether the events depicted on [a] video, taken in the light most favorable to [the nonmoving party], show that the Officers' conduct was objectively reasonable").

## IV. Discussion

### a. Eighth Amendment Claim

During the incident in question, Plaintiff suffered a black eye, facial and bodily bruising, and a chipped front tooth. Ex. M, ECF No. 64-14. Defendants concede that such injuries are sufficiently serious to satisfy the objective prong of the Eighth Amendment inquiry, and the Court agrees. *See, e.g.*, *Thaddeus-X v. Love*, 215 F.3d 1327 (6th Cir. 2000) (unpublished) (holding that "pain, swelling, and lacerations to [plaintiff's] hand" from having a food slot door slammed on his hand were sufficiently serious to state a claim under the objective prong).

As to the subjective prong, security camera video recording shows Defendants attending to the intoxicated driver, who is peering through the window into the day room where Plaintiff sat with other inmates. Ex. 8, "Booking Property" video at 8:48:34, ECF No. 61. In the video, it is not possible to see what Plaintiff and the other prisoners were doing in the day room at the time, but Defendants testified that Plaintiff and the other prisoners were "yelling and screaming" in an attempt to rile up the drunk prisoner. Allen Dep., ECF No. 64-6, PageID.1360. Plaintiff disputes personally participating in the yelling and screaming, but he

does not deny that he said something directed to the intoxicated prisoner or that others were doing so. Dedes Dep., ECF No. 64-2. PageID.1315. The parties thus do not dispute that prisoners in the day room, visible to the intoxicated driver through the window, were raising some kind of a ruckus. Under these undisputed conditions, it was reasonable for Pecha to give the order for all prisoners to lock down.

In response to the lockdown order, the prisoners filed back into Unit B and can be seen making their way into their cells. Ex. 8, "Interior B Unit Hall" video at 8:48:39, ECF No. 61. But Plaintiff can be seen exchanging words with Allen while other prisoners look on. *Id.* Upon being told to turn around and approach so that he could be taken to a separate cell away from the other inmates, Plaintiff raises his arms half-way, palms-up, in what appears to be a gesture of protest, and visibly accelerates toward one of the officers, Defendant Allen. Defendant Allen then directs him through the doorway and toward the opposite wall. Upon reaching the wall, instead of complying and placing his hands behind his back, Plaintiff twists back toward Defendant Allen. Plaintiff claims that he "only put his hands against the windows . . . to prevent his face from being smashed against the glass, and did not display any signs

of aggression towards Defendants." ECF No. 64, PageID.1267. This assertion is belied by the videotape. It is clear from the videotape that Plaintiff is not simply placing his hands against the windows to stop his momentum and then complying with the officer so that he may be handcuffed. Rather, Plaintiff pushes off the wall and turns around more than ninety degrees at his waist toward Allen. Ex. 8, "A-B Hallway" video at 8:49:26, ECF No. 61. Plaintiff admits that as he was turning, he yelled at Allen to "get her hands off of" him, though he debates whether he added the explicative "f-ing" before the word "hands". Dedes Dep., ECF No. 64-2, PageID.1333.

At this point, Plaintiff's admittedly argumentative verbal statements, combined with his clearly visible physical acts inconsistent with compliance—specifically, raising his hands when approached by Allen and whirling around to face Allen when he was being forced toward the wall—gave Defendants reason to believe that Plaintiff intended to actively resist Allen's orders.

The case law in this area makes it clear that officers may use reasonable force when a person's conduct amounts to resisting arrest. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (defining "active

resistance" as "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance"); *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (unpublished) (defining "active resistance" as "physically struggling with, threatening, or disobeying officers"). Here, one of the officers, Defendant Stimage, testified that he believed Plaintiff was about to strike Allen. Stimage Dep., ECF No. 64-8, PageID.1400. After Defendant Allen appeared to be having difficulty with Plaintiff, other Defendant officers stepped in to assist Allen with handcuffing Plaintiff, and a scuffle ensued, with all parties shuffling down the hall—one Defendant officer holding onto Plaintiff's left arm as he careened to his right. Ex. 8, "A-B and Property" video at 8:49:32, ECF No. 61. Defendants continued to visibly struggle to contain Plaintiff as the parties shuffled to the window on his left before Defendants brought Plaintiff to the ground. *Id.* at 8:49:45. Viewing this video, no reasonable juror could conclude that Plaintiff's conduct was consistent with that of a person complying with attempts to restrain him.

The gravamen of Plaintiff's complaint concerning excessive force, however, focuses on the actions taken by the Defendant officers once Plaintiff is taken to the ground. After Plaintiff is rolled to his stomach,

Defendant Zaliwski can be seen administering knee strikes to Plaintiff's hip region, while Defendant Yardon can be seen issuing knee strikes to Plaintiff's upper body. Ex. 8, "A-B Hallway" video at 8:49:50–50:47, ECF No. 61. Defendant Marschke can be seen striking Plaintiff in the head with his forearm. *Id.* Also during this brief struggle, the flash of Defendant Pecha's taser can be seen through the tangle of arms and legs. *Id.*

Plaintiff's Eighth Amendment argument focuses largely on these knee strikes and use of a taser. Under Sixth Circuit precedent discussing these types of force, "[a] simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff*, 791 F.3d at 642. Here, to varying degrees depending on the camera-perspective and the timing, the view of Plaintiff is obstructed by Defendants, who are crouched over him during the commotion, so it is not always possible to see precisely what Plaintiff is doing. At the same time, viewing the video as a whole, it is clear that the entire group of officers appeared unable to handcuff Plaintiff without physically taking hold of him—with some difficulty—and bringing him to

the ground. Even once on the ground and on his stomach, Defendants can be seen struggling to contain Plaintiff, using knee strikes and the taser. *See* Ex. 8, "A-B Hallway" video at 8:49:47–50:32, ECF No. 61. However, once Plaintiff was secured at approximately 8:50:33, Defendants all visibly relax at the same time and begin to stand up. Ex. 8, "A-B Hallway" video at 8:50:33, ECF No. 61. There are no blows administered after Plaintiff is clearly restrained. Under these circumstances, the law permitted Defendants to utilize knee strikes and a taser until Plaintiff was secured and could no longer resist. *See Rudlaff*, 791 F.3d at 642; *see also Williams v. Sandel*, 433 Fed. App'x 353, 363 (6th Cir. 2011) (not excessive force to tase the suspect thirty-seven times (and use batons and pepper spray) because he actively resisted arrest).

If the taser and knee strikes were the only uses of force deployed, the level of force would not appear to be excessive. But Defendant Marschke's repeated striking of Plaintiff's head with his forearm is another matter. In the video, Marschke, the officer nearest to the doorway, can be seen positioned above Plaintiff's head, neck and shoulders. Ex. 8, "A-B Hallway" video at 8:49:51, ECF No. 61.

Marschke's forearm is pressing down on what appears to be Plaintiff's head—though Marschke says it is Plaintiff's shoulder—and beginning at 8:49:54, he can clearly be seen in the video striking Plaintiff in what appears to be the head three times with his forearm. *Id.* at 8:49:54-49:59. At that point, another officer walks in front of the camera and the view of Marschke is obscured. *Id.* at 8:49:59. It cannot be seen whether or not Marschke continued to strike Plaintiff's head after the view was obstructed. Marschke states that the reason he was striking Plaintiff in the head is because one of Marschke's legs had gotten trapped under Plaintiff's body when Plaintiff was forced to the ground. Marschke Dep., ECF No. 64-27, PageID.1750. It is not possible to confirm Marschke's account from the videos however, as Marschke's torso and lower body are obscured by the angle of the camera and the positions of Plaintiff and the other Defendants. What is clear from the videos though, is that Plaintiff was on his stomach with multiple officers on his back at the time Marschke can be seen striking his head. Other officers were attempting to handcuff his wrists, which had been pulled behind him. With multiple officers using their weight to pin Plaintiff to the ground, Plaintiff almost certainly did not have control over his range of motion so that he could

have freed Marschke's leg even if he wanted to. This should have been apparent to Marschke as he was striking Plaintiff on the back of the head.

After Plaintiff was brought back to his feet, he was escorted to his cell. Video shows Plaintiff, with his pants caught underneath his feet, unwilling or unable to walk as he is being pushed down the hallway. Ex. 8, "Booking Detox" video at 8:52:01–05, ECF No. 61. In the corner of the video, Plaintiff can be seen bumping into a door, which caused Plaintiff to chip his tooth. *Id.* at 8:52:07. Plaintiff alleges that he was purposely pushed into the door, but Plaintiff's collision with the door appears to be an accident—the result of three large men pushing another large man careening uncontrollably down a hallway. The video does not support an inference that Defendants maliciously caused Plaintiff to chip his tooth.

In sum, in ruling on a summary judgment motion in an Eighth Amendment case, the Supreme Court has advised courts that:

> Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but

17

it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice. Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

*Whitley*, 475 U.S. at 321–22 (internal quotations and citation omitted).

Under the standard set forth in *Whitley*, Plaintiff must provide some evidence that Defendants acted "maliciously and sadistically for the very purpose of causing [him] harm" rather than "in a good faith effort to maintain or restore discipline." *Id.* at 475 U.S. 320–21. Here, Plaintiff's chipped tooth, black eye, and bodily bruising are unquestionably evidence of a physical struggle, but alone they are not evidence that the struggle was motivated maliciously and sadistically for the purpose of causing him harm. The parties do not dispute that the prisoners were yelling and screaming. This provided a legitimate basis for Defendants to order a lockdown and place Plaintiff in a different cell. Plaintiff's confrontational attitude and lack of compliance is also visible on the video, providing additional reason for him to be physically restrained. It is clear from a

review of the video that Plaintiff resisted Defendants' attempts to move him to another cell, and that Defendants had legitimate concerns about a possible escalation of the situation given the number of unsecured inmates that can be seen in relatively close proximity to Plaintiff in the videos. With respect to the knee strikes and tasering, the video does record two officers delivering knee strikes to Plaintiff, and also shows the taser being deployed, but this level of force alone, lasting over a period of about 60 seconds, is not sufficient for a finding of malicious or sadistic conduct. It is also clear from the videos that the knee strikes and tasering ceased once Plaintiff was handcuffed. Viewing the evidence in light of the videotapes, the Court finds that no reasonable juror could find that the Defendants, with the exception of Defendant Marschke, were acting maliciously and sadistically in using the level of force that they used, or that they did so for the very purpose of causing Plaintiff harm.

Defendant Marschke's strikes to Plaintiff's head are another matter. At the time Marschke was delivering forearm strikes to Plaintiff's head, Plaintiff was simultaneously being tased, hit by knee strikes, held down under the body weight of multiple officers, and had both arms grabbed by Defendants as they were attempting to handcuff

him.  While Marschke states that he struck Plaintiff's head and shoulder area because his leg was caught underneath Plaintiff, under these circumstances, Plaintiff likely could not have gotten Marschke's leg out from underneath him even if he had wanted to.  Nevertheless, the in the video Marschke can be seen striking Plaintiff in the head multiple times anyway.  It could well be that this sequence of events resulted in Plaintiff's black eye.  The Court takes all of these circumstances into account when assessing whether a reasonable juror could find that Marschke's striking of Plaintiff's head was the product of a good faith effort to restore discipline or that it was applied maliciously for the purpose of causing harm.  *See Whitley*, 475 U.S. at 321 (courts must assess "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted.").  Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find the evidence sufficient to show that striking Plaintiff on the head multiple times under these circumstances did not further Defendants' attempt to gain physical control over Plaintiff and was performed maliciously to cause Plaintiff pain.  Consequently, the question of Defendant Marschke's liability for his apparent strikes to

Plaintiff's head is an issue of material fact unsuitable for this Court to decide on summary judgment.

The Court must next assess whether Defendant Marschke is entitled to qualified immunity. "The qualified immunity analysis entails two general steps, which can be considered in any order." *Godawa v. Byrd*, 798 F.3d 457, 462–63 (6th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Seales v. City of Detroit*, 724 F. App'x 356, 359 (6th Cir. 2018) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). "To qualify as clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir. 2015) (alteration in original) (internal quotation marks omitted) (quoting *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015)).

Under these circumstances, the Court concludes that Defendant Marschke is not entitled to qualified immunity. As already discussed, a reasonable jury could find that Defendant Marschke violated Plaintiff's

constitutional rights when he struck Plaintiff on the head multiple times during the incident. With regard to the second prong, the "salient question" is "whether the state of the law in [2016] gave [Defendant Marschke] fair warning that [his] alleged treatment of [Plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Here, as far back as 1992 the law was clearly established that a prison officer cannot strike an inmate in the head multiple times when doing so would serve no legitimate penological purpose. *See Hudson*, 503 U.S. at 12 (holding that it violated the Eighth Amendment when a prison guard punched a shackled inmate in the face following an argument.). Accordingly, Defendant Marschke is not entitled to qualified immunity. Plaintiff's claim with respect to Defendant Marschke must go to a jury.

### b. *Monell* Claims

Plaintiff also alleges *Monell* liability against Defendant Macomb County under a failure to train, supervise or discipline theory.

The Supreme Court has approved municipal liability based on § 1983 when "the [municipal] action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers,"

or where such actions emanate from informal governmental custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). In other words, the constitutional violation must have sprung from "official policy" in one form or another. *Id.* at 694. As such, local government units cannot be held liable mechanically for their employees' actions under a respondeat superior theory. *Id.* at 691. The plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). When a § 1983 plaintiff alleges that a "failure to train" led to his injury, courts in the Sixth Circuit require the plaintiff to prove "three distinct facts": "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury.'" *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989)).

Here, Plaintiff has failed to establish an underlying constitutional violation except with respect to Defendant Marschke's use of forearm strikes to Plaintiff's head. Thus, only Defendant Marschke's training,

discipline and supervision is relevant to the *Monell* analysis. It is undisputed that Defendant Marschke served as an officer in Macomb County from 2002 to 2017. Marschke Dep., ECF No. 64-27, PageID.1740. During that time, he received yearly training in use of force. *Id.* The training was both in person and on a computer. *Id.* And he received yearly written reviews of his conduct. *Id.* The Macomb County use of force training manual is not in the record in this case, but there is testimony in the record that the police academy training includes 160 hours of classroom work broken down into fourteen modules. Misch Aff., Ex. 21, ECF No. 58-22, PageID.1201. Once on the job, officers must complete twenty hours of in-service training annually. *Id.* at PageID.1202. Another judge in this district recently reviewed Macomb County's officer training and found it to be "robust and constitutionally sound." *Hubble v. Cty. of Macomb*, No. 2:16-CV-13504, 2019 WL 1778862, at *26 (E.D. Mich. Apr. 23, 2019) (Borman, J.).

On the record before it, this Court has no reason to question that finding. In this Circuit, Plaintiff has the burden of demonstrating that Defendant Marschke's training, supervision or discipline was inadequate. *Harvey v. Campbell County Tenn.*, 453 F. App'x 557 (6th Cir.

2011).  Plaintiff has pointed to no specific deficiency in Defendant Marschke's training. Plaintiff submits no evidence of past instances of failures to train Defendant Marschke and presents no evidence of superior or more effective training standards practiced elsewhere that should have been implemented by the County.  Although Plaintiff argues that the officers violated the County's policies by failing to each individually write a report following the incident, Plaintiff fails to show how a failure to report after the incident could possibly have been the "moving force" behind Plaintiff's injuries.  *See Bryan Cnty. Bd. of Comm'rs*, 520 U.S. at 404.  Consequently, Plaintiff has failed to demonstrate that there is a triable issue of material fact and Defendant Macomb County is entitled to summary judgment on Plaintiff's *Monell* claims.

## V.    Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 58) is **GRANTED IN PART AND DENIED IN PART**.    All Defendants except Marschke are entitled to summary judgment.    Plaintiff's Eighth Amendment claim against Defendant Marschke remains.

**SO ORDERED.**

DATED March 31, 2020.

BY THE COURT:


/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge